DISTRICT COURT OF APPEAL OF FLORIDA
SECOND DISTRICT

_____

HAROLD GREENAKER and LISA GREENAKER,

Appellants,

v.

UNIVERSAL PROPERTY & CASUALTY INSURANCE
COMPANY,

Appellee.

No. 2D2024-1964

_____

May 8, 2026

Appeal from the Circuit Court for Hillsborough County; Emily Ann
Peacock, Judge.

Mark A. Nation of The Nation Law Firm, Longwood, for Appellants.

David A. Noel and Kara Rockenbach Link of Link & Rockenbach, PA,
West Palm Beach, for Appellee.


ATKINSON, Judge.

Harold and Lisa Greenaker (the Greenakers) appeal the trial court's
final judgment in favor of their property insurer, Universal Property &
Casualty Insurance Company (Universal). The Greenakers argue on
appeal that the trial court erred by granting Universal's motion in limine
to exclude all the Greenakers' evidence of damages and by utilizing the

motion as a substitute for a motion for summary judgment with the effect of disposing of the Greenakers' case before trial. We reverse the final judgment and remand for further proceedings consistent with this opinion.

**I.**

Universal issued a property insurance policy to the Greenakers that provided building coverage for "direct physical loss" at "replacement cost without deduction for depreciation," subject to certain exceptions not relevant to this appeal. In the loss settlement provision, the policy also provided the timing in which such "[c]overed property losses are settled": "[Universal] will initially pay at least the actual cash value of the insured loss, less any applicable deductible. [Universal] will then pay any remaining amounts necessary to perform such repairs as work is performed and expenses are incurred." *See also* § 627.7011(3)(a), Fla. Stat. (2020) ("In the event of a loss for which a dwelling . . . is insured on the basis of replacement costs . . ., the insurer must initially pay at least the actual cash value of the insured loss, less any applicable deductible. The insurer shall pay any remaining amounts necessary to perform such repairs as work is performed and expenses are incurred.").

The Greenakers sued Universal, alleging that their home sustained damage from a storm in November 2020. They further alleged that they provided Universal with an estimate documenting "covered damages . . . for replacement cost value and actual cash value" but that Universal breached the contract by "refus[ing] to pay for all [their] damages." In its second amended answer and affirmative defenses, Universal admitted that it "partially extended coverage and issued a payment" pursuant to the policy. Universal also raised several affirmative defenses invoking

2

policy exclusions that precluded coverage for any damages incurred within the scope of those exclusions.

Universal subsequently moved in limine to prevent the Greenakers from introducing evidence at trial concerning both the actual cash value and the replacement cost value of the loss. Universal argued that because the Greenakers "did not complete repairs at the subject property or incur expenses in repairing the allegedly damaged property prior to suit, . . . they cannot show entitlement to replacement cost value, and are limited to actual cash value as their measure of damages." Nevertheless, Universal also argued that the Greenakers could not introduce any evidence of actual cash value because they had "not presented any testimony or evidence during discovery concerning the actual cash value of the loss" and instead "provided a replacement cost value estimate for work that had not been performed."

In response, the Greenakers filed a copy of a written repair estimate prepared by their general contractor. The estimate contained several line items. Some line items described the physical property that was damaged, the associated replacement cost for that property, the amount of that property's depreciation, and the actual cash value of the property. Other line items described labor costs that were necessary to repair the damaged property, such as painting or laying out floor protection, and detaching and resetting items such as sinks, a dishwasher, and a granite countertop. The estimate subtracted the amount for the property's depreciation from the replacement cost value of each line item, except for the labor costs to which it indicates that depreciation does not apply.

The Greenakers argued that because "[a]ctual cash value is generally defined as fair market value or replacement cost minus depreciation," their estimate constituted admissible evidence of the

actual cash value of the insured loss. The Greenakers also accurately pointed out that the actual cash value estimate prepared by Universal's expert included similar items and calculated actual cash value in precisely the same manner—starting with the replacement cost value and applying depreciation to physical property but not deducting depreciation for other included items such as the labor cost for removing shingles, flashing, and solar panels.

At the hearing, Universal asked the trial court—in addition to granting the motion in limine—to grant a directed verdict in its favor because the Greenakers were "basically going in[to] the trial without the evidence they need," to which the trial court responded, "Like an oral Motion for Summary Judgment?" The Greenakers argued that the issues Universal raised "should be handled post verdict" and that it "seem[ed] that [Universal] [w]as trying [a] summary judgment . . . argument." The trial court announced at the hearing that it was granting the motion in limine, reasoning that the Greenakers' estimate reflected the replacement cost—not the actual cash value—"because the work has not been done."

Before the trial court issued a written order on the motion in limine, the Greenakers filed a combined motion for reconsideration and response to Universal's "motion for entry of judgment," though the record does not show that Universal ever filed a motion for entry of judgment, which argued in relevant part that Universal's motion in limine "was tantamount to a motion for summary judgment." The record does not contain a ruling on the Greenakers' request for reconsideration. Nevertheless, the trial court issued an order in limine precluding the Greenakers from introducing any evidence of their damages based on the replacement cost value or the actual cash value. That same day, the trial court entered a final judgment in Universal's favor, which referenced the

4

ruling on Universal's motion in limine and included the following reasoning:

8. Plaintiffs failed to proffer any estimate listed as a trial exhibit that met the legal definition of an actual cash value estimate.

9. Plaintiffs' exhibits included replacement cost estimates, which is not the correct measure of damages.

10. Plaintiffs do not have proof of damages pursuant to the proper measure of damages and will be unable to prove damages at trial.

After the trial court entered the final judgment, the Greenakers filed a motion for rehearing and reconsideration of the final judgment and the order in limine. They reiterated that their written estimate was evidence of the actual cash value of the insured loss and that Universal had "improperly converted its motion in limine . . . into a motion for final summary judgment." The trial court denied the motion in an unelaborated order.

## II.

The Greenakers argue on appeal that the trial court's order in limine and final judgment "were procedurally improper" because they were tantamount to granting a motion for final summary judgment in Universal's favor. We agree.

The trial court's final judgment does not specify whether its entry was prompted by a party's motion or some other request. The judgment indicates that the trial court heard Universal's motion in limine at a hearing and that the trial court was making "find[ings]" "after granting such motions." However, there is no recognized procedure under Florida law that authorizes the entry of a final judgment based on a trial court's pretrial ruling in limine. To be sure, recognized procedures for a trial court's pretrial disposition of a case exist, such as summary judgment,

5

judgment on the pleadings, and default judgment. *See* Fla. R. Civ. P. 1.510(a) ("A party may move for summary judgment, . . . [and] [t]he court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."); Fla. R. Civ. P. 1.140(c) ("After the pleadings are closed, but within such time as not to delay the trial, any party may move for judgment on the pleadings."); Fla. R. Civ. P. 1.500(e) ("Final judgments after default may be entered by the court at any time . . . ."). We need not endeavor to list all such authorized procedures to conclude that the procedure the trial court used in this case to enter a final judgment before trial is not one of them.

Because "the purpose of a motion in limine is to prevent the introduction of improper evidence, the mere mention of which at trial would be prejudicial," the "use of the motion begins to become improper" when it "is used to do more than merely exclude" such evidence. *Buy-Low Save Ctrs., Inc. v. Glinert*, 547 So. 2d 1283, 1284 (Fla. 4th DCA 1989) (citing *Dailey v. Multicon Dev., Inc.*, 417 So. 2d 1106, 1107 (Fla. 4th DCA 1982)). A motion in limine cannot be used as a substitute for a dispositive pretrial motion such as a motion to dismiss or for summary judgment. *See id.* ("[T]rial courts should not allow motions in limine to be used as unwritten and unnoticed motions for partial summary judgment or motions to dismiss." (first quoting *Brock v. G.D. Searle & Co.*, 530 So. 2d 428, 431 (Fla. 1st DCA 1988); then citing *Rice v. Kelly*, 483 So. 2d 559, 560 (Fla. 4th DCA 1986); and then citing *Dailey*, 417 So. 2d at 1106)); *see also Interamerican Eng'rs & Constructors Corp. v. Palm Beach Cnty. Hous. Auth.*, 629 So. 2d 879, 881 (Fla. 4th DCA 1993) ("A motion in limine is not a substitute for a motion for summary judgment." (citing *Buy-Low Save Ctrs.*, 547 So. 2d at 1284)), *disapproved on other*

*grounds, County of Brevard v. Miorelli Eng'g, Inc.*, 703 So. 2d 1049 (Fla. 1997); *Rice*, 483 So. 2d at 560 (concluding that the trial court erred by using an oral motion in limine to "summarily dismiss a portion of a claim").  Yet that is what the trial court did in this case, using Universal's motion in limine to summarily dispose of the Greenakers' case before trial.[1]

Universal attempts to defend the trial court's final judgment by arguing that a trial was futile after the trial court's in limine ruling.  Indeed, the trial court reasoned in the final judgment that based on the ruling in limine, the Greenakers "d[id] not have proof of damages pursuant to the proper measure of damages and w[ould] be unable to prove damages at trial."  But that reasoning only underscores the trial court's error.  The trial court did not rule—nor did Universal argue—that the Greenakers' evidence was *inadmissible*, and neither the trial court nor Universal predicated its analysis on any rule of evidence.  Rather, the trial court made substantive rulings—as Universal urged below—concerning what it concluded to be the correct measure of damages and concluded that the Greenakers' evidence was based on the wrong measure of damages.  As such, the trial court's resolution was the functional equivalent of a summary judgment ruling premised on the conclusion that the Greenakers lacked any evidence to prove an essential element of their breach of contract claim.  *See In re Amends. to Fla. Rule of Civ. Proc. 1.510*, 317 So. 3d 72, 75 (Fla. 2021) ("[I]f the nonmoving party must prove *X* to prevail [at trial], the moving party at summary

---

[1] Universal acknowledged at oral argument that the trial court treated its motion in limine as a motion for summary judgment. Universal's argument that the Greenakers acquiesced to the trial court's procedure in doing so is unsupported by the record.

7

judgment can either produce evidence that *X* is not so *or point out that the nonmoving party lacks the evidence to prove X.*" (alterations in original) (emphasis added) (quoting *Bedford v. Doe*, 880 F.3d 993, 996–97 (8th Cir. 2018))); *see also Saunders v. Alois*, 604 So. 2d 18, 19–20 (Fla. 4th DCA 1992) ("The trial court's ruling was erroneous because the motion in limine was in essence a substitute for a motion for partial summary judgment on a portion of the damage claim of appellant."); *Buy-Low Save Ctrs.*, 547 So. 2d at 1284 ("[W]e agree with Buy-Low's assertion that the trial court's grant of the Glinerts' motion in limine was tantamount to an improper summary judgment on the issue of how the damages owed by the Glinerts were to be calculated."); *Dailey*, 417 So. 2d at 1107 ("Appellee, by way of its motion in limine, attempted to summarily dismiss a portion of appellant's case. The trial court was asked to rule that as a matter of law appellee was not liable to appellant for damages to the wall. Appellee's action is comparable to a motion for summary judgment . . . .").

At the hearing on the motion in limine, the trial court cited a decision from the Circuit Court for the Sixth Judicial Circuit in support of its ruling. While the reasoning of learned trial judges can be of great benefit as persuasive authority, circuit court decisions lack precedential value. *See Vachon v. Travelers Home & Marine Ins.*, 403 So. 3d 451, 454 (Fla. 2d DCA 2025) ("Trial courts do not create precedent."). More importantly, the circuit court decision relied upon by the trial court in this case was an order granting the defendant's motion for directed verdict. Because "[a] motion for directed verdict is not an evidentiary ruling" but instead "raises the legal sufficiency of the [nonmoving party's] evidence," *Martinez v. Lobster Haven, LLC*, 320 So. 3d 873, 879 (Fla. 2d DCA 2021), the trial court's reliance on the circuit court decision further

8

indicates that it was not making the type of evidentiary ruling appropriate for a motion in limine. The trial court erred by allowing Universal's motion in limine to be used as a substitute for a motion for summary judgment and by summarily disposing of the Greenakers' case before trial without following the required summary judgment process or any other established method of pretrial adjudication pursuant to an applicable rule of procedure. *See generally* Fla. R. Civ. P. 1.510(c) (describing the procedures for a summary judgment proceeding); *cf. Abundant Living Citi Church, Inc. v. Abundant Living Ministries, Inc.*, 213 So. 3d 1055, 1057 (Fla. 3d DCA 2017) (reasoning that trial courts "may not short-circuit th[e summary judgment] process").

### III.

However, there is another reason the trial court should not have gotten as far as determining that the Greenakers "w[ould] be unable to prove damages at trial" because they "d[id] not have proof of damages pursuant to the proper measure of damages" (let alone so far as to enter judgment after granting the motion in limine but before any dispositive motion had even been filed): its decision to exclude the Greenakers' damages evidence on the basis that it did not constitute evidence of the actual cash value was erroneous. In this appeal from a final judgment, the trial court's resolution of that matter—effectuated in the order granting the motion in limine—is before the court and warrants review. *See Blackburn v. Boulis*, 184 So. 3d 565, 567 (Fla. 4th DCA 2016) ("[A]n appeal from a final order calls up for review all necessary interlocutory steps leading to that final order, whether they were separately appealable or not." (alteration in original) (quoting *Saul v. Basse*, 399 So. 2d 130, 133 (Fla. 2d DCA 1981))); *see also* Fla. R. App. P. 9.110(h) (providing that

9

on appeal from a trial court's final order, the district court "may review any ruling or matter occurring before filing of the notice" of appeal).

The Greenakers challenge the trial court's conclusion that they "failed to proffer any estimate listed as a trial exhibit that met the legal definition of an actual cash value estimate."[2] The parties dispute how actual cash value should be calculated. The policy does not define actual cash value or otherwise explain how to calculate it. The trial court defined actual cash value as "the value of the property that suffered a direct physical loss, less depreciation, less deductible," and Universal defends that definition on appeal. The Greenakers, on the other hand, argue that actual cash value necessarily includes the amount of repair costs—in addition to the value of the property that suffered a direct physical loss—because it is calculated as the replacement cost minus depreciation. Because the resolution of the parties' dispute involves the interpretation of an insurance policy, our review is de novo. *See Am. S. Home Ins. v. Lentini*, 286 So. 3d 157, 158 n.2 (Fla. 2019).

Universal and the trial court advance an inordinately narrowed definition of actual cash value (ACV) that includes only the cost of physical materials that were damaged and excludes all other intangible costs such as the labor required to install such materials. Universal describes the Greenakers' intangible costs—such as labor—required to install the physical items to replace the damaged property as "indirect, anticipated future repair costs," and Universal contends that such costs "were simply not ACV because they were not actual, tangible physical damage directly caused by the storm (e.g., wind damage or interior water

---

[2] The trial court concluded that actual cash value was the correct measure of the Greenakers' damages in this case. No party challenges that conclusion on appeal, and we do not reach the question of its merit.

10

damage)."  "Anticipated future repair costs," Universal argues, "are included in RCV [replacement cost value] only, not ACV."

Consistent with that rationale, the trial court concluded that the Greenakers "failed to proffer any estimate listed as a trial exhibit that met the legal definition of an actual cash value estimate," reasoning that actual cash value constitutes only "the value of the *property* that suffered a direct *physical* loss, less depreciation, less deductible."  (Emphasis added.)  Universal echoes this formulation on appeal, contending that "ACV cannot include any costs to match undamaged property because such costs are not a direct physical loss."

This definition is supported neither by the language of the replacement value insurance contract, the statute governing replacement value insurance contracts, nor the decisional authority elaborating on the meaning of the term *actual cash value* as contrasted with *replacement cost value.*  For starters, the phrase "direct physical loss" has been cherry picked from another provision of the insurance policy—the "PERILS INSURED AGAINST" provision—and injected into the provision at issue in this case—the loss settlement provision.  The former provision provides as follows:

> **SECTION I – PERILS INSURED AGAINST**
> **A.  Coverage A – Dwelling And Coverage B – Other Structures**
> 1.  We insure against direct physical loss to property described in Coverages **A** and **B**[, subject to various exceptions and exclusions not relevant to this appeal.]

The loss settlement provision, appearing in a separate section of the policy, orders the chronology of payment obligations, requiring initial payment of the actual cash value of the "insured loss," *not* "direct physical loss":

> **D. Loss Settlement**

11

> . . . Covered property losses are settled as follows:
>
> . . . .
>
> 2. Buildings and screened enclosures covered under Coverage **A** or **B** at replacement cost without deduction for depreciation, subject to the following:
>
> . . . .
>
> d. We will initially pay at least the actual cash value of the insured loss, less any applicable deductible. We will then pay any remaining amounts necessary to perform such repairs as work is performed and expenses are incurred, subject to **2.a.** and **2.b.** above . . . .

The latter provision, at issue in this case, does not contain the phrase "direct physical loss." Rather, in setting forth the timing of the payment obligations by which "[c]overed property losses are settled," the loss settlement provision uses the term "insured loss" when describing what the initial payment obligation will be: "[Universal] will initially pay at least the actual cash value of the insured loss, less any applicable deductible." Thus, the qualifier "actual cash value" indicates a method of valuation of the entire "insured loss"—not an exclusion of non-"physical" costs as Universal would have us believe. *Cf. First Acceptance Ins. v. At Home Auto Glass, Inc.*, 365 So. 3d 1278, 1280 (Fla. 6th DCA 2023) ("At Home's interpretation of the phrase 'amount of loss' as limited to the extent of physical damage is unreasonable."); *Mendota Ins. v. At Home Auto Glass, LLC*, 348 So. 3d 641, 643 (Fla. 5th DCA 2022) ("A determination of 'the amount of the loss' necessarily includes determining both the extent of covered damage and the monetary amount necessary to repair or replace the damaged property" and is not "limited to a determination of the extent of physical damage." (citing *Cincinnati Ins. v. Cannon Ranch Partners, Inc.*, 162 So. 3d 140, 143 (Fla. 2d DCA 2014))).

Additionally, Universal's argument proves too much. The "direct physical loss" phrase—indicating what perils are insured against in the description of "Coverage"—would apply equally to actual cash value and

12

replacement cost value under Universal's conception of the loss settlement provision. The loss settlement provision into which the trial court and Universal have imported the phrase "direct physical loss" addresses not only "actual cash value" but also the remaining cost that would constitute the full extent of the *replacement* cost coverage under the policy. Thus, if applicable to the loss settlement provision, the phrase "direct physical loss" would have to be applied to both the actual cash value and replacement cost value measures of damages—which is at odds with the result of the trial court's decision to, at Universal's urging, to apply it only to the former but not the latter. The necessary consequence of the interpretive conflation of the PERILS INSURED AGAINST provision and the loss settlement provision—ignored by the trial court and Universal—is that under both the actual cash value and the replacement cost value measures of damages, an insured would only be entitled to the cost of physical materials that had been damaged and would *never* be entitled to recover the necessary costs of installing such materials. Universal and the trial court cannot elide this absurd result by arbitrarily assigning the phrase "direct physical loss" to the concept of actual cash value but not to the replacement cost value that is also a subject of the loss settlement provision into which they attempt to shoehorn the "direct physical loss" language taken from the coverage provision indicating the perils insured against. In short, Universal and the trial court have rewritten the loss settlement provision by adding extraneous language from another provision of the insurance contract.

In their newly formed definitions of "actual cash value" and "replacement cost value," the trial court and Universal draw a distinction between the value of the damaged *physical property* and the value of the *labor and other costs* required to install or reconstruct that property—a

13

dichotomy between the cost of tangible materials and the intangible costs necessary to provide an insured with proper coverage under the policy. But this distinction finds no support in the language of the policy, the statute, or case law explaining the meaning of those terms. To the contrary, the distinction between "actual cash value" and "replacement cost value" is related to *depreciation*—which is deducted from the former but not the latter. "In contrast to a replacement cost policy, actual cash value is generally defined as 'fair market value' or '[r]eplacement cost minus normal depreciation,' where depreciation is defined as a 'decline in an asset's value because of use, wear, obsolescence, or age.' " *Trinidad v. Fla. Peninsula Ins.*, 121 So. 3d 433, 438 (Fla. 2013) (alteration in original) (first quoting *Black's Law Dictionary* 506, 1690 (9th ed. 2009); and then citing *Goff v. State Farm Fla. Ins.*, 999 So. 2d 684, 689 (Fla. 2d DCA 2008)). "In other words, replacement cost policies provide greater coverage than actual cash value policies because depreciation is not excluded from replacement cost coverage, whereas it generally is excluded from actual cash value." *Id.* (citing *Goff*, 999 So. 2d at 689); *accord Goff*, 999 So. 2d at 689 (" '[A]ctual cash value' is an often-used appraisal term, generally synonymous with 'market value' or 'fair market value.' Fair market value accounts for the property's depreciated condition." (alteration in original) (citation omitted) (quoting and citing *Am. Reliance Ins. v. Perez*, 689 So. 2d 290, 291 (Fla. 3d DCA 1997))); *cf. Value, Black's Law Dictionary* (10th ed. 2014) (defining "actual cash value" as "[r]eplacement cost minus normal depreciation"); *Value, Black's Law Dictionary* (12th ed. 2024) (defining actual cash value as "[r]eplacement cost minus normal depreciation and obsolescence").

In support of this false distinction, Universal relies on inapposite case law in which courts were analyzing whether an actual, physical loss

as opposed to a nonphysical loss had occurred or whether direct as opposed to indirect physical loss had occurred. *See, e.g., People's Tr. Ins. v. Gunsser*, 373 So. 3d 422, 427 (Fla. 6th DCA 2023) ("The LWD endorsement only applies to 'covered property' that suffers '[s]udden and accidental *direct physical loss*.' " (alteration in original) (emphasis added)); *Commodore, Inc. v. Certain Underwriters at Lloyd's London*, 342 So. 3d 697, 702 (Fla. 3d DCA 2022) ("[B]ecause the ordinary meaning of 'physical' carries a tangible aspect, 'direct physical loss' requires some actual alteration to the insured property."); *Homeowners Choice Prop. & Cas. v. Maspons*, 211 So. 3d 1067, 1069 (Fla. 3d DCA 2017) ("A 'loss' is the diminution of value of something, and in this case, the 'something' is the insureds' house or personal property. 'Direct' and 'physical' modify loss and impose the requirement that the damage be actual." (citation omitted) (citing *Loss, Black's Law Dictionary* (10th ed. 2024))). In this case there is no dispute that a direct physical loss occurred, triggering coverage.

Recorded opinions actually addressing the interplay between actual cash value and replacement cost value tell a different story. Indeed, further belying the false distinction inherent in Universal's proposed definitions of actual cash value and replacement cost value is case law indicating that costs *other than* that of physical materials should be included in a calculation of *actual cash value*. The Florida Supreme Court has approved of this court's interpretation of actual cash value as including costs other than damaged physical property, acknowledging approvingly the conclusion that "overhead and profit are part of actual cash value" and "may, like other costs, be depreciable." *Trinidad*, 121 So. 3d at 443.

> The Second District correctly determined, in essence, that overhead and profit are like all other costs of a repair, *such as labor* and materials, the insured is reasonably likely to incur. The Second District therefore held that a portion of overhead and profit, like a portion of *all* other costs, was included but could be depreciated in an actual cash value policy.

*Id.* at 438 (emphasis added) (citation omitted) (citing *Goff*, 999 So. 2d at 689–90).

Thus, the difference between actual cash value and replacement cost value is not one between types of costs—materials versus labor, damaged property versus overhead expenses—but rather a difference in the valuation of those costs with the distinction being a depreciated versus an undepreciated value. *See Goff*, 999 So. 2d at 690 ("As replacement cost policies are intended to operate, following a loss, both actual cash value and the full replacement cost are determined. The difference between those figures is withheld as depreciation until the insured actually repairs or replaces the damaged structure." (quoting Leo John Jordan, *What Price Rebuilding?*, 19 ABA Fall Brief 17, 21 (1990))). In other words, the term actual cash value does not serve to differentiate between *what* costs are incurred—that is, the rendering of services or the provision of physical materials—but rather *how* costs are *valued*—that is, what they could fetch on the market after depreciation versus the undepreciated cost necessary to replace all the value that the insured has lost. *See id.* at 689 (" '[A]ctual cash value' is . . . generally synonymous with 'market value' or 'fair market value.' . . . Fair market value accounts for the property's depreciated condition." (quoting *Perez*, 689 So. 2d at 291)).

Universal's conception of the distinction between actual cost value and replacement cost value is further flawed by its contortion of the meaning of the word "replacement" to serve a purpose other than that

16

indicated by the context of the insurance policy. In light of the reasoning of the decisional authority cited above and the context in which the word appears, the term "replacement" does not refer exclusively to the labor and other *services* required to effectuate the repair of damaged property. Rather, the term is used to communicate the objective of *replacing* what the insured once had—the full value of the insured's loss as a result of the destructive event as opposed to a reduced value that accounts for depreciation. *See Trinidad*, 121 So. 3d at 438 ("Replacement cost is measured by what it would cost to replace the damaged structure on the same premises . . . . In other words, replacement cost policies provide greater coverage than actual cash value policies because depreciation is not excluded from replacement cost coverage, whereas it generally is excluded from actual cash value." (internal quotation marks omitted) (first quoting *Davis v. Allstate Ins.*, 781 So. 2d 1143, 1144 (Fla. 3d DCA 2001); and then citing *Goff*, 999 So. 2d at 689))). Without any support, Universal would urge us instead to consider the root verb *replace* to mean the *act* of replacing individual physical items; this meaning allows Universal to differentiate labor and other nontangible costs from the cost of physical items themselves and include those costs only in their *replace*ment value calculation. But that is not what "replacement" means in context. Rather, the term "replacement" conveys a restoration of the insured to his or her pre-event status in which all that the insured had before the loss has been *replaced*; the term "replacement" thusly serves to differentiate the *entire* cost to replace what was lost from the partial cost calculated according to its "actual cash value" at a rate that takes into account the depreciation of the assets. *See id.* ("Replacement cost insurance is designed to cover the difference between what property is actually worth and what it would cost to rebuild or repair that

property. . . . In contrast to a replacement cost policy, actual cash value is generally defined as 'fair market value' or '[r]eplacement cost minus normal depreciation . . . .' " (first quoting *State Farm Fire & Cas. Co. v. Patrick*, 647 So. 2d 983, 983 (Fla. 3d DCA 1994); and then quoting *Black's Law Dictionary* 506, 1690 (9th ed. 2009)).

Similarly unavailing would be any attempt to construe the phrase "remaining amounts necessary to perform such repairs as work is performed and expenses are incurred" as necessarily indicating a distinction between the purportedly exclusive cost of the damaged physical property assigned to "actual cash value" from intangible costs that would only be assigned to replacement value and not included in the former. To the contrary, that phrase in context only indicates the *timing* of when differently valued amounts are required to be paid—the former being due "initially" and the latter due "as work is performed and expenses are incurred." And nothing in the loss settlement provision indicates that the phrase "remaining amounts" refers to a different *type* of cost payable according to replacement value than what is payable in the initial actual cash value payment. *Cf. Trinidad*, 121 So. 3d at 439 ("[O]verhead and profit are a necessary component of replacement costs, *just as they are for actual cash value* . . . ." (emphasis added)). Rather, in light of the language of the provision in context and according to the reasoning of applicable case law, the phrase "remaining amounts" indicates the delta between the depreciated cost according to actual cash value that the insurance company initially paid and what is left to be paid according to the full, undepreciated replacement value reflected by the "expenses [that] are incurred" after the work is actually "performed."

Universal relies on judicial opinions excluding matching costs from actual cash value to support its position in this case. *See Vazquez v.*

18

*Citizens Prop. Ins.*, 304 So. 3d 1280, 1285 (Fla. 3d DCA 2020) (excluding from actual cash value "costs to replace undamaged items in order to match [the insured's] continuous floor"); *see also Citizens Prop. Ins. v. Salazar*, 388 So. 3d 115, 118 (Fla. 3d DCA 2023) ("Further, projected matching costs are not included as part of the actual cash value of an insured loss and an insurer is only obligated to pay such costs as the repairs are performed." (citing *Vazquez*, 304 So. 3d at 1285–86)). However, these opinions, issued by another district, do not make Universal's case that the labor and other intangible costs included in the Greenakers' estimate were properly excluded by the trial court as incompatible with an actual cash valuation. Regardless of the rectitude of the Third District's exclusion of matching costs from actual cash value—a question on which this court need not opine to resolve this appeal[3]—it cannot be used to support the categorical exclusion of *all* costs other than that of physically damaged tangible property from the actual cash value of damages in this case.

In other words, this court is not compelled to exclude intangible costs such as labor, profit, and overhead from actual cash value because the Third District reasoned that the cost of replacing undamaged property for purpose of matching cannot be included in the definition of actual cost value. Instead, consistent with the statutory and contractual language, and in accordance with Florida Supreme Court precedent and the other decisional authority cited above, this court is compelled to conclude that such nonmaterial costs are indeed appropriate to include in the calculation of actual cost value. *See Trinidad*, 121 So. 3d at 438

---

[3] Notably, the Greenakers avowedly did not include matching costs in any of the estimates adduced in support of the actual cash value of their damages.

19

(recognizing that "overhead and profit are like *all other costs* of a repair, *such as labor* and materials, the insured is reasonably likely to incur" and "like a portion of *all other costs*," can be "included but . . . depreciated in an actual cash value policy" (emphasis added) (citing *Goff*, 999 So. 2d at 689–90)).  The trial court erred when it excluded such costs on the basis that they could not constitute evidence consistent with an actual cost value measure of damages.

## IV.

The trial court's final judgment is reversed, and the case is remanded to the trial court for further proceedings consistent with this opinion.

Reversed and remanded.

LUCAS, C.J., and BLACK, J., Concur.

---

Opinion subject to revision prior to official publication.